IN THE COURT OF APPEALS OF THE STATE OF IDAHO

**Docket No. 37246**

| | | |
|---|---|---|
| IN THE MATTTER OF JANE DOE, JOHN DOE, JOHN DOE I, JOHN DOE II, CHILDREN UNDER EIGHTEEN YEARS OF AGE. | ) ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | 2011 Opinion No. 9 |
| Petitioner-Respondent, | ) ) | Filed: March 3, 2011 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JOHN DOE III, | ) ) | |
| Appellant-Respondent. | ) ) ) | |

Appeal from the Magistrate Division of the District Court of the Fifth Judicial District, State of Idaho, Cassia County. Hon. Mick Hodges, Magistrate.

Decree terminating parental rights, <u>reversed</u>, and <u>case remanded</u>.

Robinson Anthon & Tribe, Rupert, Michael P. Tribe for appellant.

Hon. Lawrence G. Wasden, Attorney General; James T. Baird, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Appellant John Doe III appeals to this Court from the magistrate's order terminating his parental rights to his four children. We reverse and remand.

## I.

## FACTS AND PROCEDURAL HISTORY

Appellant John Doe ("Father") and his former wife ("Mother") are parents to four children, a girl and three boys. At the time of the hearing on the petition to terminate Father's parental rights, the girl, who suffered from spina bifida, was fifteen years of age, the twin boys were eleven years old, and the youngest boy was nine.

On September 27, 2008, Father, while under the influence of alcohol, struck one of the twin boys leaving a red mark on the boy's face. Father was arrested and charged with injury to a child. Upon observing that the family residence was filthy and unsanitary, the officers notified the Idaho Department of Health and Welfare (the Department), and a social worker was sent to the scene. The children told the social worker that their father was an alcoholic whose condition was so severe that he kept a bucket next to his recliner to throw up in, and that Father sometimes hit them when he was drunk. The family was also facing eviction from their home for nonpayment of rent.

The children were deemed to be in imminent danger and were taken into the temporary custody of the Department. Father and Mother, who were then contemplating divorce, stipulated that the children had been subject to abuse and neglect, and should remain in shelter care pending an adjudicatory hearing. On further stipulation, the magistrate court ordered that the children remain in the Department's custody for an indefinite period. The order also directed that a case plan be prepared with the primary goal of reunification of the family.

On November 10, 2008, the Department filed a case plan, later approved by the court, with the stated goal of reunifying the family. The case plan recognized Father's abuse of alcohol and assigned to him tasks focused on his achieving and maintaining sobriety. It required that he be evaluated for substance abuse and "follow all recommendations for treatment," attend two Alcoholics Anonymous (AA) meetings per week, and provide documentation of alcohol treatment and AA attendance to the Department twice per month. The plan also focused on rebuilding the parents' relationship with their children and improving their parenting abilities. To this end, the case plan called for the parents to attend parenting training and to provide a certificate of completion to the Department, attend weekly supervised visits with the children and demonstrate appropriate parenting skills during the visits, and determine whether they qualified for certain psychological and skill-building services. In addition, the case plan addressed the need for financial stability, requiring the parents to work full-time and prepare and submit bi-weekly budgets to the Department. The parents further agreed to provide adequate housing with sufficient bedrooms for the children "if and when the children are returned."

By the time the case plan was adopted, Father had bonded out of jail following his arrest on the charge of injury to children. Soon thereafter, he completed a substance abuse evaluation and was diagnosed as alcohol dependant. The evaluation recommended intensive outpatient

2

treatment services. Father immediately began alcohol treatment and AA, providing documentation of attendance to the Department. He also attended three weekly visits with his children. However, in early December, Father began drinking alcohol again and, shortly thereafter, ceased contact with the Department. He was also fired from his job. Father surfaced again when he was arrested for public intoxication on January 17, 2009. He ultimately pleaded guilty to both the public intoxication charge and the injury to children charge. The same judge presiding in this case imposed sixty days in jail for the public intoxication offense, followed by probation. Father was released on probation on March 19, 2009, with sentencing on the injury to children charge still pending.[1]

Two months later, on May 22, 2009, the Department filed a report stating that Father was "working his program," was in compliance with his probation terms, and had submitted to four alcohol tests in the preceding two months, which disclosed no alcohol use. The Department also reported that Father had been rehired by his former employer and was living at his place of employment rent-free, had completed a mental health evaluation that found no mental illness, had been attending his alcohol treatment sessions and completing his outside written assignments, and was making progress through the various programs. However, the report also said that Father had not complied with certain of his case plan provisions in that he had not yet paid any child support and had not turned in a budget or any AA attendance slips. The Department also noted that Father "was not in a position to provide a safe and stable environment for the children to reside." The Department recommended that the children remain in the Department's custody and opined that because the children had been in shelter care since September 27, 2008, "[p]ermanency needs to be decided now."

The children's guardian ad litem also filed a report in May that detailed strides made by Father in regaining employment and complying with alcohol treatment. The guardian commended Father's parenting at his weekly visitations with his children during which he helped with the children's homework, engaged them in activities, and on their birthdays brought birthday gifts and cake. The guardian concluded that Father:

> since being released from jail, has made every effort to work his case plan, maintain employment, and re-establish a loving bond with his children. It is

---

[1] For the injury to children charge, Father eventually was placed on probation and was in compliance with probation at the time of the termination hearing.

3

evident that when he is not using alcohol, he is a vastly different person. He appears to be earnest and anxious to comply with all that is asked of him. He frequently expresses gratitude and a willingness to do whatever is in the best interest of his children. The fear that he would relapse is ever present as well as the uncertainty that he would be available to be a resource with the possibility of further incarceration.

Based on the Department's report and arguments at a May 27, 2009, hearing, the magistrate court ordered that "the Department shall cease reunification efforts because of the failure of the parents to comply with the case plan and the parents are not in a position to provide a safe and stable environment for the children to reside." The order also directed the Department to file a petition to terminate the parents' parental rights.

The assigned social worker thereupon told Father that because reunification efforts had ceased, Father was no longer required to comply with the case plan. However, the social worker also said that Father could continue his efforts to complete the case plan and explain those efforts at the anticipated parental termination hearing. About the same time, the Department garnished Father's wages for child support owed while the children were in foster care. Father sought, and was granted, the Department's permission to continue his weekly visits with his children.

In compliance with the magistrate court's order, the Department filed a petition to terminate the parents' parental rights on July 31, 2009. As against Father, the grounds for termination were that he "did neglect the children" before they were taken into custody on September 27, 2008, and that:

> the neglect has continued by his failure to perform [the] case plan. Specifically, he has continued to participate in criminal activity and has been in and out of jail. He has not completed drug and alcohol treatment. He has failed to provide financial support for the children and has failed to establish adequate housing or financial security.

The termination hearing was scheduled for November 19, 2009. In August 2009, the parents divorced.

In September 2009, the Department and the guardian filed case review reports. The Department said that Father was still employed but had not yet obtained housing for the children, that he visited his children and had been appropriate with them, and that the issue to be determined at the pending termination hearing was whether "parental rights are terminated or parents are given more time to complete a case plan." The guardian's report again commended Father for his case plan progress since the last report in May, stating:

4

Doe continues employment. . . . His employer also allows him to live at their office to help him become financially stable. . . . [Father] is participating in substance abuse treatment, attends several AA meetings weekly and participates in visits with his children. He has maintained employment and in fact, his employer provides him boarding in their office and has been very supportive of him. His healthy countenance and participation in the activities listed above, all suggest [Father] is remaining sober. During the visits, he is appropriate and loving with the children. He has spoken openly with them about his need for alcohol treatment and speaks positively of the children's foster parents. He has not been able to find suitable housing but has made efforts, asking the GAL to visit a prospective home to determine its suitability. He intends to contest the termination of his parental rights and still hopes desperately to be re-unified with his children. Notably, [Father] has always remained in contact and spoken willingly and graciously with the GAL.

Following receipt of these reports, on September 29, 2009, the court held a twelve-month permanency hearing. At the hearing, Father provided an overview of his efforts toward reunification and case plan progress in the four-month period following the last court hearing. The court nevertheless ordered that the termination hearing would go forward as scheduled.

Thereafter, Father filed a motion to disqualify the magistrate judge for cause, contending that the judge's comments made at the September 29 hearing showed that he had prejudged the case and was biased against Father. The judge denied the motion.

At the termination hearing, Mother consented to termination of her parental rights as to all four of the children, and the hearing proceeded as to Father. After the presentation of evidence, Father requested more time within which to finish his alcohol treatment, become more financially stable, and complete other portions of his suspended case plan. The court denied his request and orally announced that it was terminating Father's parental rights. Thereafter, the court issued a decree in which it determined that Father had abused and neglected the children and that termination of his parental rights was in the best interests of Father and the children.

## II.

## ANALYSIS

### A. Standards of Review

The United States Supreme Court has held that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment of the United States Constitution. *Quilloin v. Walcott*, 434 U.S. 246, 255-56 (1978); *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). *See also In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). Concordantly, the Idaho Legislature has, in the Child Protective Act,

5

directed "that the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." Idaho Code § 16-1601. Likewise, the Termination of Parent and Child Relationship Act states, "Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001.

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 746; *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009); *Doe*, 146 Idaho at 761, 203 P.3d at 691; *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). *See also* I.C. § 16-2009. The United States Supreme Court noted three factors that called for employment of this elevated standard of proof: the permanence and irrevocability of a termination of parental rights; the reality that "the State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense";[2] and the imprecision of the standards to be applied, such as "the best interest of the child," which "leave determinations unusually open to the subjective values of the judge."[3] *Santosky*, 455 U.S. at 759-63.

---

[2]    The Court explained:

No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

*Santosky*, 455 U.S. at 763 (footnote omitted).

[3]    According to the Court:

[In a termination] proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. *See Smith v. Organization of Foster Families*, [431 U.S. 816, 835 n.36 (1977)] (Judges "may find it difficult, in utilizing vague standards like 'the best interests of the child,' to avoid decisions resting on subjective values."). In appraising the nature and quality of a complex series of encounters among the

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Doe*, 148 Idaho at 245-46, 220 P.3d at 1064-65. The appellate court "will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated." *Id. See also In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). The Idaho Supreme Court has also said, however, that, "the substantial evidence test requires a greater quantum of evidence in cases where the trial court finding must be supported by clear and convincing evidence, than in cases where a mere preponderance is required." *Id.* Clear and convincing evidence "is generally understood to be '[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.'" *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006) (quoting Black's Law Dictionary 577 (7th ed. 1999)). Further, "the magistrate's decision must be supported by 'objectively supportable grounds.'" *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## B. Grounds for Termination

Idaho Code § 16-2005 authorizes termination of the parent/child relationship when it is in the child's best interest and any one of several factors exist, including neglect or abuse. Here, the Department's petition is based on allegations of neglect. A "neglected" child is defined in I.C. § 16-1602(25)(a) and (b) as one:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or
> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . .[4]

---

agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent.

*Santosky*, 455 U.S. at 762, 102 S.Ct. at 1399 (footnote omitted, parenthetical added).

[4] Idaho Code § 16-2002(3)(b) also defines "neglect" as occurring where "[t]he parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code." This time standard is defined as when "a child is

**C.** **The Magistrate's Decision to Terminate Father's Parental Rights Was Erroneous**

The magistrate court held that Father had abused[5] and neglected his children and that termination was in their best interests and the best interest of Father. On appeal, Father does not challenge the finding that, prior to removal of the children from his home, they were neglected and mistreated. At the termination hearing, Father described his past conduct as "despicable" and said that he was "appalled at myself." Father argues, however, that the magistrate erred in finding that termination was in the best interests of himself and the children and was warranted as of the date of the termination hearing because uncontroverted evidence showed that he had made and was continuing to make substantial strides in treatment for his alcoholism, maintaining sobriety, rebuilding a loving relationship with his children, and achieving financial stability that would enable him to provide appropriate housing for his children. He contends that in light of his progress that was demonstrated at the termination hearing, the magistrate erred in refusing to allow Father additional time to continue that progress and prepare to resume custody of his children. We agree.

First, we note that the trial court's decision faults Father for noncompletion of some case plan tasks that were not actually part of his case plan. For example, the decree states that Father "has not completed anger management counseling," but anger management counseling was not referenced in the case plan. Father nevertheless had recognized a need for such counseling and had voluntarily enrolled in such a program about six weeks before the termination hearing. The decree also faults Father for not having a driver's license which, again, was not required by the

---

placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care." I.C. § 16-1629(9). In this case, we evaluate the magistrate's finding of neglect based only on the definitions set forth in I.C. § 16-1602(25)(a) and (b), as the children were not in the custody of the Department for the requisite time specified in I.C. § 16-1629(9) to fall within the I.C. § 16-2002(3) definition of neglect.

[5]    Although the Department's petition alleged only neglect and not abuse as a ground for termination, the magistrate based his decisions on findings of both neglect and abuse. Father does not claim error in this regard on appeal, and we do not address it.

case plan. Both Father and his employer testified, however, that he was taking all steps necessary to reinstate his driver's license.

The substantive focus of the case plan called for Father to address three major deficiencies before the children would be returned to him: he was required to overcome his alcohol abuse, build a healthy relationship with his children and gain parenting skills, and achieve financial stability so that he could provide a proper home. The magistrate's findings gave little or no acknowledgement to the strides that Father had made toward each of these primary goals. We will examine the trial evidence and the magistrate's corresponding findings on each of these.

To address Father's alcohol abuse, the case plan called for him to cease alcohol use, be tested for alcohol periodically, attend AA meetings and alcohol treatment classes, and submit documentary proof of compliance with these requirements to the Department. The evidence at the termination hearing showed that shortly after the case plan was adopted in mid-November 2008, Father completed a substance abuse evaluation, began AA and alcohol treatment, and provided documentation of his attendance to the Department.[6] Although he relapsed in December and was arrested for public intoxication in January 2009, the evidence showed that after his release from jail on March 19, 2009, he consistently passed all alcohol tests and maintained sobriety through the date of the termination hearing. Father testified without contradiction that since his release from jail in March, he had been working more than full-time, attending AA meetings one to three times per week, and attending prescribed alcohol treatment classes Monday through Thursday for two to three hours per evening. In addition, he voluntarily attended a support group for three to four hours each Friday night at a church. Father said that he had learned that his first priority must be sobriety, and without that, addressing his children's needs was not possible. Father gave no excuses for his return to drinking in December 2008 or

---

[6] The trial court's findings state that during this time Father "did not attempt to complete the case plan, visit the children, or pay [child] support." The first two statements are contrary to the evidence, as the Department witnesses testified that Father had visited the children, had completed a substance abuse evaluation, had begun treatment, and had submitted documentary proof. He did fail to pay child support at this time, but he was indigent and had just been released from jail.

9

his arrest for public intoxication in January 2009; rather, he expressed appreciation for the trial court's jailing him for two months to "dry out," and said that this had brought him to his senses.

Testimony of his treatment providers confirmed that Father had ceased alcohol use and vigorously pursued treatment throughout the eight-month period after his March 19 release. One provider described the intensive outpatient program as requiring class attendance four evenings per week, approximately three hours per night, as well as completion of outside work. She gave glowing assessments of Father's participation, stating that he attended all classes, completed all assignments, was frank regarding his struggles with alcohol, and had remained sober. A written report from an alcohol treatment supervisor likewise said Father's progress was excellent, and that "[i]n my opinion and years of doing drug and alcohol counseling, [Father] is really truly and honestly working his program. [Father] made mistakes in the past and is working hard towards healing himself so that he can be an excellent father to his children whom he loves very much." Another letter from the treatment provider agency concluded:

> I know [Father] has a long history of alcoholic problems in the community. I know he has long rejected any type of help. I am here to share that he is and has been receptive to help for the past 9 months and is continuing to seek this support. I hope that my letter will find an opening to consider him having access and a chance to reunite with his children.

After receipt of this very positive evidence about Father's success and dedication to maintaining his sobriety, the magistrate's related findings were:

> When he got out of jail he did begin to work parts of the case plan. He began alcohol treatment and has apparently remained sober. His sobriety has been at the top of his priorities, but he has not been faithful at reporting his progress or his attendance at AA meetings to the Department; . . . by his admission, he had not completed alcohol treatment to the date of the hearing.

These findings give inadequate attention to the uncontroverted evidence that since March 2009, Father had faithfully complied with the case plan requirements that he cease using alcohol, obtain alcohol treatment, participate in AA, and obtain regular testing. The implication in the magistrate's decision that Father was not in compliance with the case plan because he had not "completed alcohol treatment to the date of the hearing," is incorrect because the case plan contains no completion date for the alcohol treatment, and there was no evidence that Father was failing to make timely and satisfactory progress through the treatment program. The findings also focused on Father's omission to submit written reports to the Department. This focus not only elevates a minor reporting element of the case plan above its far more substantive and

10

significant requirements of behavior change, but also fails to recognize that following the court's May 2009 order directing the Department to cease reunification efforts, the case plan was no longer in effect, and Father therefore was no longer required to submit reports to the Department.

With respect to the second principal goal of the case plan--that Father develop an appropriate parental relationship with his children and acquire parenting skills--the uncontroverted evidence again demonstrated great progress by Father. Numerous witnesses testified that immediately after the children were removed from the family home, they feared their father and dreaded visitation with him, but after March 2009, this had changed. The boys' foster father testified that they initially "wanted nothing to do" with Father, but after interacting with him during the post-March weekly visitations, the boys thought their father "near perfect" and "couldn't say anything wrong about their dad." He also testified the fifteen-year-old daughter had a calendar on which she was marking the days to the termination hearing because she expected to be reunited with her father that day. A Department employee who had supervised approximately thirty weekly visits said that, after initially being apprehensive, the children warmed up to Father; and that Father had changed over time, had evidenced that he was ashamed of his prior treatment of his children, had apologized to the children for hurting them, and had cried in their presence. She said that Father was also physically improved in that he was now "well kept." She testified that she never observed any inappropriate behavior by Father during the visits and never smelled alcohol on him or suspected that he had been drinking before a visit. A treatment provider said that when she observed Father with the children, he was kind and nurturing and that he desperately wished to be reunited with them. A Department social worker said that since March 2009 he "appears to be sober and happy and clean and a hard worker" and has a good relationship with his children. Father acknowledged that he had not yet begun a parenting class required by his case plan because there had been no time in his schedule for it in addition to his alcohol treatment, other classes and AA commitments, but that he was scheduled to start the parenting class in about one week upon completion of one of his alcohol treatment classes. The children insisted on testifying at the termination hearing. They acknowledged that they were better cared for by their foster parents than they had been in the family home when Father was drinking, but now that he was sober, they expressed excitement at the prospect of being reunited with him.

The magistrate's findings make no mention of Father's relationship with his children or his behavior during weekly visitations. The only related finding is that "he has not completed parenting training." The finding includes no acknowledgement that schedule conflicts for some of the classes and treatment requirements of the case plan precluded Father from participating in all of them at the same time.

The third and final primary factor that the case plan required Father to address was his financial situation and ability to provide suitable housing for the children. On this issue, the evidence again demonstrated that Father had made commendable progress. That evidence included the testimony of Father's employer, the owner of a multi-site car wash business. He said that Father had worked as manager of one of the car wash sites from 1997 to 1999, and that in 2005 the employer contacted Father to convince him to return to the business, to which Father agreed. Thereafter, Father's alcohol abuse became evident, and when he failed to appear for work in December 2008, the employer fired him. When Father was released from jail in March 2009, however, the employer rehired him, but started Father at a low level job. The employer said that Father had worked his way back to the position of manager, with responsibility for supervising, hiring, and firing other employees. The employer said that the business had been operating at a loss when Father resumed management and that he quickly brought the business back to profitability. According to the employer, Father was working six days per week at a salary of $2,000 per month plus incentives and a percentage of the profit. He said that another manager with the same salary plan at a smaller car wash facility owned by the employer had earned $47,000 the prior year, and that the employer expected that Father could earn that much or more in the upcoming year. The employer testified that Father currently had limited disposable income because his wages had been garnished by the Department for child support and there were separate garnishments for Father's and Mother's medical and vehicle debts. The employer said that he allowed Father to reside rent-free in the business's office so that he could save money to provide housing for his children if they were returned to his custody. The employer confirmed that Father was attending treatment after work each night and was working diligently to get his driver's license reinstated. He said that once relicensed, Father would receive the use of a company vehicle with a gas allowance.

The employer also said that to aid Father in his efforts to regain custody, he had contacted a realtor and found an appropriate four-bedroom house for sale or rent (the record is

12

unclear) that would serve the needs of the children, and that the employer was willing and able to immediately make a "down payment" to acquire the home for Father. The payment had not yet been made because the employer first wanted to know if the magistrate was going to terminate Father's parental rights as the payment would be wasted if Father did not regain custody. Father testified that in addition to garnishments for child support and past debts, he was paying fees for his mandated drug tests and for probation supervision. Father acknowledged that at present, he was not financially able to provide a proper home for his children, but believed that in three to four months he could do so.

In the face of this information about Father's earning capacity and his prospect for acquisition of appropriate housing, the magistrate's only relevant findings were that Father was "currently living in his employer's car wash office and has no home for the children to return to" and "has provided no budgeting information to the Department, and has, thus, not demonstrated financial stability to raise his children." Once again, instead of giving attention to Father's progress on substantive issues, the magistrate court focused on Father's noncompliance with reporting requirements that actually had not been applicable since May 2009 when the court ordered cessation of reunification efforts and Father was informed that the case plan no longer applied. The magistrate's decision also did not take into account the effect on Father's ability to obtain appropriate housing caused by the Department's choice to garnish his wages to pay for child support at a rate of approximately $600 per month.

A judicial evaluation of whether termination of parental rights is warranted must take into account practicalities of a parent's individual situation, as illustrated in *Doe v. State*, 137 Idaho 758, 53 P.3d 341 (2002), where the father was imprisoned and had never seen his two-year-old son. His parental rights were terminated on findings that he had abandoned and neglected the child. Our Supreme Court reversed, stating:

> There is an issue, however, of what actions Doe could have taken, once in prison, to maintain contact with his child. Doe sent his child gifts and made efforts to contact the child through the Department and through the child's maternal grandmother, but he was unsuccessful. One must ask what more could Doe have done? The Department's argument is that he could have completed the "rider" program successfully and gotten out of prison early. The magistrate accepted this as evidence of abandonment. That is not the type of substantial competent evidence that supports a finding by clear and convincing standard of abandonment. The Department trivializes Doe's efforts to have a relationship with his son. Reality must play a part at two levels: 1) Doe was severely

13

restricted in what he could do. Within that context he tried to establish a relationship. 2) The Department did little or nothing to assist in that effort. The Department focused on the best interest of the child--laudable in the abstract but without regard for the parental rights possessed by Doe.

*Id.* at 761-762, 53 P.3d at 344-45.

Likewise, the practical realities of Father's financial situation must be considered. He was indigent and being evicted from his home when he was initially arrested and his children were removed. Father spent the next two months in jail before he was able to bond out. He worked for about a month before he began drinking again and lost his job. From mid-March 2009, when he was released from jail, Father was continuously employed, working his way up to the position of manager. He was working more than forty hours each week, but much of his paycheck was consumed by garnishments, supervision fees and alcohol testing fees required as terms of his probation. The Department did little or nothing to assist in Father's efforts to improve his financial capacity but, rather, diminished it by garnishing his wages. The evidence indicated that Father had done all he reasonably could to improve his financial situation, that he potentially could earn in excess of $45,000 per year, and that there was a reasonable prospect that he soon would be able to provide a suitable home for his children. That he was not able to do so immediately on the date of the termination hearing does not demonstrate that it was in the best interests of the children to terminate his parental rights.

The magistrate's determination that termination was in the best interest of Father's children relied in part upon opinion testimony of the social worker and the guardian ad litem, both of whom recommended termination. We conclude that the reliance on these opinions was misplaced because the reasons given by these witnesses for their recommendations do not withstand scrutiny. The guardian, after repeatedly filing reports lauding Father's progress and efforts to reunite with his children, recommended termination because "it's too large of a gamble to gamble on the father's sobriety, that conditions in the home wouldn't revert back to the conditions they had before." That is, because Father could not provide a guarantee that he would never use alcohol again, the guardian was of the view that his parental rights should be terminated. Were the guardian's reasoning adopted, no parent with an addiction would ever be able to regain custody of his or her child. That is not the standard under Idaho law for terminating a parent's fundamental right to a relationship with his children. The social worker's reasons for recommending termination were similarly unconvincing. He said that because of

Father's incarcerations, he had not been a resource for the children from the time the children were taken into shelter care in late September 2008 until he was released from jail in mid-March 2009. This recommendation ignores all of Father's progress and accomplishments from mid-March forward and the evidence that he never missed a visitation opportunity when not incarcerated and had exhibited appropriate and nurturing parenting behavior during visitations.

It appears that the guardian, the social worker, and the court may have incorrectly viewed the court's only options at the termination hearing as either to terminate Father's parental rights on that day or return the children to Father on that day. That was not the choice, however. The only issue presented was whether Father's parental rights would be terminated at that time, not whether he was able to resume custody immediately. If termination had been denied, the children would have remained in foster care pending further proceedings. As Father urges on appeal, the court could have allowed additional time for Father to demonstrate whether he would be able to secure appropriate housing, improve his financial situation, and continue his commitment to sobriety; and his efforts could have been aided by the Department resuming a role of working to facilitate reunification.

This case bears considerable resemblance to *In re Doe*, 142 Idaho 594, 130 P.3d 1132 (2006), where an infant was placed in foster care due to the mother's (Roe's) failure to provide adequate care. After Roe's completion of a case plan, the child was returned to her under protective supervision, but six months later the child was removed again because Roe was arrested for selling methamphetamine and using illegal drugs. Another reunification plan was adopted during which Roe began to turn her life around. She married, submitted to drug testing which she passed, and through supervised visitation developed an emotional bond with the child and was learning appropriate parenting. The trial court terminated Roe's parental rights, but the Idaho Supreme Court held that the trial court erred by focusing on Roe's criminal record and her behavior two years earlier while disregarding her case plan progress and success in becoming a better parent. The Court said that the testimony demonstrated that:

> . . . Roe created a stable life, made her children her priority, successfully complied with and went beyond the court orders and the reunification plan, attended counseling and Alcoholics Anonymous and Narcotics Anonymous meetings, and was not likely to relapse or become involved with criminal activity again. Further, contrary to the magistrate court's findings, the evidence indicates that [her child] and the parental termination action were a motivating factor in Roe's

15

decision to straighten out her life and for Roe's successful compliance with the reunification plan and probation.

*Id.* at 598, 130 P.3d at 1136. Much the same comments could be said of Father in the present case.

The *Roe* Court also said:

The magistrate division also erred by making what appears to be a subjective, rather than an objective decision. In family law cases, there is a "requirement of explicit findings [which] encourages a trial judge to rely upon objectively supportable grounds for his decision, and discourages subjective or attitude-influenced perceptions of the case. Without [an] objective basis, trial court fact-finding [becomes] . . . a soft spot in the administration of justice." *Donndelinger v. Donndelinger*, 107 Idaho 431, 437, 690 P.2d 366, 372 (Ct. App. 1984).

*Id.* at 599, 130 P.3d at 1137.

Also instructive is the Idaho Supreme Court's decision in *Schultz v. Schultz*, 145 Idaho 859, 187 P.3d 1234 (2008), where the Court discussed a trial court's duties when considering the best interests of a child in the context of a child custody dispute in a divorce action. The Court criticized the magistrate for basing his best-interest-of-the-child decision on only one factor--the distance between the father and child that was created by the mother's move to Oregon. The Court said that this over-emphasis on a single factor, and the failure to consider other relevant factors in evaluating the best interests of the child, constituted an abuse of discretion. *Id.* at 865, 187 P.3d at 1240. The Court concluded, "The magistrate court should have examined all the evidence to determine [the child's] best interest and reached a supported, well reasoned conclusion before entering its order. Since the Court failed in this duty, it abused its discretion." *Id.* at 866, 187 P.3d at 1241.

We conclude that the magistrate court made much the same errors in this case as were found to have occurred in *Roe* and *Schultz*. The court's decision placed excessive emphasis upon Father's admittedly abhorrent behavior prior to the removal of the children from his home and upon minor noncompliance with reporting requirements that had not been in effect for half a year prior to the termination hearing, while disregarding or giving minimal attention to the compelling evidence of Father's success in overcoming alcoholism, complying with treatment requirements, maintaining remunerative employment, and becoming a nurturing parent with whom the children had developed a strong bond. The evidentiary record does not provide objectively supportable grounds for the trial court's decision that termination of Father's parental rights was in the best

interests of the children and Father at the time of the termination hearing. Therefore, the decision of the magistrate court must be reversed and the case remanded.[7]

**D.     Motion to Disqualify the Magistrate for Cause**

Because we have reversed the termination decision on the merits, it is unnecessary to determine whether the magistrate judge erred in denying Father's motion for disqualification at the time the motion was made. However, because the child protective proceedings will continue in the magistrate division hereafter, it is appropriate to examine Father's claim of judicial bias as it may affect future proceedings.

Father's motion to disqualify the judge was based on the judge's comments at a September 29, 2009, "permanency hearing." After Father had provided an overview of his efforts toward reunification and case plan progress in the four-month period following the last court hearing, the magistrate responded:

> I appreciate that. I see nothing to change my mind. I can't let these kids risk this again. You fall off the wagon, these kids go through this again. Your case is legendary, Mr. [Doe], in child protection circles.
> As badly tortured as these kids were, I have to tell you that, and I know you're trying now, but I'm not willing to risk those kids going through this again. Your little girl with no diapers.[8] I lay awake at night thinking about this case, and I have not changed my mind. I will not change my mind at this point. We'll go ahead with the [termination] hearing as planned.

Thereafter, Doe filed a motion to disqualify the magistrate for cause, contending that the comments at the permanency hearing showed that the magistrate had prejudged the case and was biased against Doe. At a hearing, the magistrate orally denied the motion, stating:

> As regard to my position on termination, I have not made up my mind, and that's not what I was determining when I made those comments. What I was determining, as [the attorney for the guardian ad litem] appropriately pointed out, was whether the termination hearing should go ahead or not. That's what I understood I was arguing about, not--I wasn't arguing the question of termination.
> This is a first for me, so I did a little research, and one comment stood out particularly to me in that--from AMJUR, "A judge's ordinary and natural reaction

---

[7]     We note that, if in proceedings on remand it is determined that termination of Father's parental rights as to his daughter is necessary due to her personal and medical care needs, that circumstance would not automatically justify also terminating his rights with respect to his sons.

[8]     Because of her spina bifida, the daughter was incontinent.

to the conduct of or evidence developed about a party in a case before him cannot create a disqualification for bias or prejudice."

I am repulsed by the reports I read, and I can't get over that. I lay awake at night thinking about that, thinking about these little children. That's very true. And I think that is an ordinary, natural reaction to anyone who heard the children were forced to drink vomit out of a bucket[9] when their father was so intoxicated he didn't know what he was doing. How can anybody else in this room act without anything but revulsion? And I'll take that one to the U.S. Supreme Court any day, [counsel].

With that, sir, I am going to deny your motion. I am not biased. I understand this is a matter of discretion. As a matter of discretion I will deny the motion for the reasons I've stated.

On appeal, the parties' arguments focus not on whether the magistrate judge was biased, but rather on whether that bias was impermissibly gained from an "extrajudicial source" in light of the comment that Father's reprehensible conduct was "legendary in child support circles." These arguments focusing on the source of the alleged bias are inapposite in view of current Idaho law regarding motions for disqualification.

Idaho Rule of Civil Procedure 40(d)(2)(A)(4) provides for disqualification for cause if the presiding judge is "biased or prejudiced for or against any party or the case in the action." In *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966), the United States Supreme Court held that to be disqualifying, the alleged bias or prejudice "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." For a number of years Idaho appellate courts followed the *Grinnell* standard. *Samuel v. Hepworth, Nungester & Lezamiz, Inc.*, 134 Idaho 84, 88, 996 P.2d 303, 307 (2000); *State, Dep't of Health & Welfare v. Doe*, 133 Idaho 826, 829, 992 P.2d 1226, 1229 (Ct. App. 1999); *Hays v. Craven*, 131 Idaho 761, 763, 963 P.2d 1198, 1200 (Ct. App. 1998); *State v. Elliott*, 126 Idaho 323, 329, 882 P.2d 978, 984 (Ct. App. 1994); *Liebelt v. Liebelt*, 125 Idaho 302, 306, 870 P.2d 9, 13 (Ct. App. 1994); *Desfosses v. Desfosses*, 120 Idaho 27, 29, 813 P.2d 366,

---

[9] The record does not indicate that any child actually was forced to do this. At the termination hearing, Father admitted that his alcoholism was so bad that he kept a bucket next to his recliner to throw up in and that he made his children empty it. He also admitted that his children told him that on one occasion when one of his children kicked the bucket over, he threatened to make the child drink out of it as punishment, and although he did not remember this he believed his children. The youngest boy told a social worker that his father ordered him to drink from the bucket on one occasion as punishment, but the boy did not do so. The only testimony that was adduced was that this threat was a single occurrence.

18

368 (Ct. App. 1991). However, both the United States Supreme Court and the Idaho Supreme Court have abandoned this approach. In *Liteky v. United States*, 510 U.S. 540 (1994), the Court held that "[t]he fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a *sufficient* condition for 'bias or prejudice' recusal, since *some* opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will *not* suffice." *Id.* at 554 (emphasis in original). Recently, in *Bach v. Bagley*, 148 Idaho 784, 229 P.3d 1146 (2010), the Idaho Supreme Court, following the reasoning of *Liteky*, implicitly overruled the prior Idaho cases.[10] Our Supreme Court held that whatever the source of the bias or prejudice, it must be "so extreme as to display clear inability to render fair judgment," that "unless there is a demonstration of 'pervasive bias' derived either from an extrajudicial source *or facts and events occurring at trial*, there is no basis for judicial recusal." *Id.* at 791-92, 229 P.3d at 1153-54 (emphasis added). The Court stated that "the standard for recusal of a judge, based simply on information that he has learned in the course of judicial proceedings, is extremely high." *Id.* at 792, 229 P.3d at 1154.[11]

In ruling on Doe's motion for disqualification, the trial judge applied the "extrajudicial source" rule that has subsequently been overruled by the Idaho Supreme Court in *Bach*.

---

[10]     The magistrate was without the benefit of the *Bach* decision at the time of his ruling.

[11]     Factors unique to child protection proceedings elevate the risk of a court prejudging a parental termination case. Parental termination hearings are likely to be preceded by extensive shelter care and child protective proceedings in which the court plays an active role. With the exception of evidentiary privileges, the Idaho Rules of Evidence are not applicable to most of these preliminary proceedings. *See* I.R.E. 101(e)(6); Idaho Juvenile Rules 39(e); 41(c). Consequently, various reports of investigators, police, case workers and guardians ad litem containing multiple-level hearsay, innuendo, opinion, and conjecture, may be viewed by the court. If a petition to terminate parental rights ensues, it is filed in the same case as the proceeding under the Child Protective Act, I.J.R. 48(b), and the same judge ordinarily presides. At a parental termination hearing, however, the Idaho Rules of Evidence do apply, and components of the record in the prior Child Protective Act proceedings are not, ipso facto, admitted or admissible at the termination hearing. I.J.R. 48(b). Thus, there is created a risk of judicial prejudgment of the termination issue, or of an ultimate judgment that is based on information that was never admitted into evidence at the termination hearing.

Therefore, on remand, the magistrate court should reconsider Father's motion for disqualification in light of the standards set forth in *Bach*.

**III.**

**CONCLUSION**

The magistrate court's order terminating Father's parental rights is reversed, and this case is remanded for further proceedings consistent with this opinion. Costs to appellant.

Judge GUTIERREZ **CONCURS.**

Chief Judge GRATTON, **DISSENTING**

As I believe that the majority has far exceeded our limited appellate role, I respectfully dissent.

**A.     Termination.**

In the section of the majority opinion entitled "Facts and Procedural History," the majority quotes from and relies heavily upon information not contained in the termination trial record. None of the Department of Health and Welfare (Department) or guardian ad litem reports referenced, and quoted at length by the majority, were admitted into evidence at the termination trial. The magistrate only took judicial notice of the case plan and its orders. The obvious point of the majority in utilizing this information is to bolster its overall assessment that Doe (Father), in the months leading up to the termination hearing, was doing well and compliant with requirements. With this backdrop from information outside the trial record, the majority turns in the "Analysis" section, largely to the trial record, drawing therefrom testimony favorable to Father's contention that he was making progress. The majority does, however, dismiss certain trial evidence as being inconsistent with the reports that were not placed in evidence. Interestingly, after relying extensively on the case worker and guardian ad litem reports, the majority, in discussing the disqualification issue, references these pre-termination reports as "containing multiple-level hearsay, innuendo, opinion and conjecture." I do not believe that the use of this information outside the trial record is proper.

In his appellate brief, Father points to certain evidence from the trial that supports his contention that he was making progress and that the magistrate should have given him more

time. Except for three discrete instances,[1] he does not contend, argue or advance that the magistrate's findings of fact were erroneous. The majority takes it upon itself to attack the magistrate's findings of fact. In doing so, the majority sets up the findings of fact and attempts to knock them down by pointing to conflicting evidence, minimizing or disregarding supporting evidence and suggesting that certain behaviors were not required of Father. For instance, the majority points to the magistrate's findings that Father did not complete anger management classes and did not have a driver's license. The majority does not deny that these statements are true, but dismisses them because they were not specific requirements of the case plan. The magistrate's determination of "neglect" is not being reviewed, as recognized by the majority, based upon failure to follow the case plan as contemplated in Idaho Code § 16-2002(3)(b). These things were basic to any evaluation of Father's ability to provide "proper parental care" and "discharge [parental] responsibilities." *See* I.C. § 16-1602(25)(a) and (b). As another example, the majority points to a very brief period of time immediately after adoption of the case plan in mid-November 2008, and suggests that Father was compliant with substance abuse, alcohol treatment and documentation. Thereupon, the majority takes to task a finding by the magistrate that Father did not complete the case plan, visit the children, or pay [child] support, suggesting the first two findings are contrary to the evidence and excusing the payment of child support because Father was indigent. However, the time period referenced in the finding is clearly from the time of the adoption of the case plan to March 2009, when Father was released from jail. As later acknowledged by the majority, Father relapsed shortly after execution of the case plan, in December 2008, was arrested for public intoxication in January 2009 and jailed

---

[1] Father takes issue only with a finding of fact which states that the children were taken into protective custody in Oregon, a finding of fact which states that his daughter needed care twenty-four hours per day, and that Father admitted needing more time to be able to fully care for his children. As to the protective custody in Oregon statement, it is an incidental detail regarding admitted involvement of the family with Oregon officials. Regarding Father's daughter needing twenty-four hour per day care, her foster mother testified as such on numerous occasions, although not thereby indicating that the daughter was bed-ridden, but indicating that she has occasions of assistance need throughout the day, including while at school. Father's real point of argument in his brief is that he was aware of her needs. Lastly, regarding Father's admission that he needed more time to be able to fully care for his children, Father does not contend he did not so state. In fact, his theme at trial and on appeal is that, with more time he could care for the children. His argument in the brief is not with the finding, but that the magistrate should have, indeed, granted him more time.

21

until March 2009.  The magistrate's finding regarding compliance during that time period was accurate.

Surprisingly, the majority criticizes the findings of the magistrate most supportive of the majority's conclusion that, after being released from jail, Father was doing the best he could. The magistrate found that:

> (f)  When he got out of jail he did begin to work parts of the case plan.  He began alcohol treatment and has apparently remained sober.  His sobriety has been at the top of his priorities, but he has not been faithful at reporting his progress or his attendance at AA meetings to the Department;
> (g)  By his admission, he had not completed alcohol treatment at the date of the hearing. . . .

The majority states that these findings give "inadequate attention"[2] to Father's abstention from alcohol and attendance at treatment and testing since March 2009.  But, on the contrary, the findings expressly recognize that, as his top priority, Father obtained treatment and remained sober after being released from jail.  The majority excuses his lack of reporting as merely a "minor" element of the case plan.  I strongly disagree that progress and attendance reporting by anyone in Father's situation to the Department is a minor or unimportant element of the case plan.  In addition, the majority states on several occasions that after the magistrate directed the Department to cease reunification efforts in May 2009, the case plan no longer existed and that the magistrate could not, therefore, fault Father for not completing plan elements.  I do not believe that the plan evaporated.  Instead, as the social workers testified, the case plan remained for Father to complete and "do everything to provide documentation and resources to the Court." The Department was relieved of its obligations, but not Father, if he wanted to demonstrate his ability to parent his children.  Finally, the majority states that the magistrate implied that Father had not complied with the case plan because he had not completed alcohol treatment at the date of the hearing, which implication is incorrect because the case plan did not have a time for completion.  The supposed implication aside, the statement made by the magistrate was true -- at the time of the hearing, Father had not completed alcohol treatment.  Whether he should have

---

[2]    The majority states that the magistrate gave "inadequate attention" to certain evidence regarding Father's progress.  What this seems to mean -- that the lower court gave inadequate attention to certain evidence -- is that the appellate court is swayed by the evidence and the magistrate should have been as well -- not that there is a lack of competent and substantial evidence to support the magistrate's determination.  The magistrate considered the evidence of Father's progress.

been granted more time to do so is the issue advanced by the majority, not the accuracy of the finding by the magistrate.

The magistrate found that Father had not completed parenting training. The majority excuses this fact because of scheduling conflicts. The magistrate found that Father did not have financial stability to raise the children. As the majority notes, Father did have gainful employment after being released from jail. The majority legitimizes his limited financial means by reference to past debts, probation supervision and mandated drug testing costs. More noteworthy is the majority's statement that "the Department did little or nothing to assist in Father's efforts to improve his financial capacity but, rather, diminished it by garnishing his wages." Respectfully, the Department had no obligation to improve Father's "financial capacity," and more importantly, garnishment of his wages was not some sort of punishment or Department whim, but for support for *his* children which he was not paying voluntarily. In regard to housing, the magistrate found that Father was "currently living in his employer's car wash office and has no home for the children to return to." Once again, this statement was true. The majority, however, chastises the magistrate for not commenting on the testimony that Father was trying to save money to get a house and his employer was willing to front some money for a house, but only if Father got his children back. In the end, the findings that, at the time of trial, Father did not have financial stability or a home to raise his children are true and, as stated by the majority: "Father acknowledged that at present, he was not financially able to provide a proper home for his children, but believed that in three to four months he could do so."

In an action to terminate parental rights, due process requires this Court to determine if the magistrate's decision was supported by substantial and competent evidence. *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006). Substantial and competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. at 345-346, 144 P.3d at 599-600. This Court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Doe v. Doe*, 148 Idaho 243, 246-247, 220 P.3d 1062, 1064-1065 (2009). Reasonable inferences are drawn in favor of the magistrate court's judgment because the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties. *In re Doe*, ___ Idaho ____, 244 P.3d 180 (2010). We conduct an independent review of the record that was before the magistrate. *Doe*, 143 Idaho at 346, 144

P.3d at 600. In an action to terminate parental rights, where a clear and convincing standard has been noted explicitly and applied by the trial court, an appellate court will not disturb the trial court's findings unless they are not supported by substantial and competent evidence. Only clearly erroneous findings are overturned, which means a reasonable person would not have relied on them in concluding as the fact finder did. *Doe v. Roe*, 142 Idaho 202, 203, 127 P.3d 105, 106 (2005).

Our limited role on appeal is to determine if substantial and competent evidence exists in the record to support the magistrate's findings. We are not to re-weigh the evidence or determine veracity. Yet, the majority notes that both the social worker and the guardian ad litem, in their professional opinions, recommended termination and then states that the testimony does not withstand scrutiny and is "unconvincing." The guardian testified that termination would be in the children's best interest, stating that "I believe that it's too large of a gamble to gamble on the father's sobriety that conditions in the home wouldn't revert back to the conditions they had before." The majority states that were the reasoning of the guardian adopted, no parent with an addiction could ever regain custody of their children. While I agree that every recovering addict is one drink, pill, or injection, to reference but a few of the more recognized addictions, away from return to destructive ways, and one cannot be disqualified from parenting solely on that fact, the "gamble" referenced here was not solely lost sobriety. The "gamble" was this particular individual's loss of sobriety. He has a long and extensive alcohol history. When not sober, it is not that he forgets to go to work or becomes depressed, no, this particular individual engages in egregious conduct directly, physically, mentally and adversely affecting his children. In regard to the testimony of the social worker, the majority relates only a small portion of the testimony supporting his opinion that termination is in the children's best interest, but his opinion was not just based on the extended family history, but also, among other things, the fact that Father did not have a home, the fact that Father did not pay child support until court ordered, the fact that Father had not completed all the requirements of the Department and the court, the positive changes in the children since being in foster care, and his opinion that, while recognizing Father had done well since March 2009, he would need an extended period of time to be able to provide a stable home situation for his children when the children need permanency now to mitigate ongoing detrimental effect. Again, our question is whether there exists substantial and

24

competent evidence supporting the magistrate's findings, indulging all reasonable inferences in favor of the magistrate's findings, not whether evidence is or is not convincing to us.

The majority minimizes virtually all evidence relating to the circumstances and conduct prior to the date of the case plan, including their lasting effects. In order to identify the significance of those past circumstances and conduct, it is important to review what the magistrate determined, what Father actually places at issue and what the majority purports to do. The magistrate determined that the children were abused and neglected and that termination was in their best interest. Regarding the finding of "abuse," the majority notes that only neglect was expressed as the ground stated in the petition for termination. However, as also noted, Father does not contend on appeal that the determination of abuse was improper from a pleading standpoint. He also does not contest the finding in any way. Thus, the magistrate's determination of abuse, under I.C. § 16-2005(1)(b), must be affirmed. Additionally, nowhere in his brief to this Court does Father challenge the magistrate's finding of neglect or contend that there is not substantial and competent evidence in the record to support the finding. Consequently, the magistrate's determination of neglect, under I.C. § 16-2005(1)(b), must also be affirmed. Father does not address, in any way, the fact that the petition alleged and the magistrate found that termination would be in the best interest of the parents. Thus, the magistrate's determination that termination would be in the best interest of Father, under I.C. § 16-2005(3), must be affirmed.

The only finding of the magistrate challenged by Father is whether termination would be in the best interest of the children, under I.C. § 16-2005(1)(b) and (3). The only evidence in the record cited by Father is that which supports his contention that beginning in March or April 2009, he "made drastic changes in his life." Based upon that evidence he asserts that termination was premature and not in the best interest of his children and that he should have been allowed "additional time to work and complete his family case plan."

The only information or evidence referenced by the majority relating to facts or circumstances prior to the children being taken into the custody of the Department is:

> On September 27, 2008, Father, while under the influence of alcohol, struck one of the twin boys leaving a red mark on the boy's face. Father was arrested and charged with injury to a child. Upon observing that the family residence was filthy and unsanitary, the officers notified the Idaho Department of Health and Welfare (the Department), and a social worker was sent to the scene. The children told the social worker that their father was an alcoholic whose

condition was so severe that he kept a bucket next to his recliner to throw up in, and that Father sometimes hit them when he was drunk. The family was also facing eviction from their home for nonpayment of rent.

In addition, the majority notes only that "at the termination hearing, Father described his past conduct as 'despicable' and said that he was 'appalled at myself.'" In this fashion, the majority is able to minimize the egregiousness of the family situation for years to focus exclusively on Father's progress in the few months leading up to the termination hearing.

The testimony demonstrates that the children were subjected to a home which was extremely dirty and unsanitary. The toilets were filthy with feces. Used adult diapers were strewn about and trash and debris nearly obscured the carpet. A strong odor of urine pervaded. The children's clothes did not fit, they were significantly behind in school and anti-social. A social worker testified that the children told her that Father was physically abusive with the children on "multiple occasions," and that Father would punch them "on a regular basis." Father had such an extensive history and depth of alcoholism that he kept a red bucket next to his recliner to vomit into "20 or 25 times a day," the horrible noise from which caused the children to cover their ears. If the children were not totally silent while Father watched NASCAR, they ate bread and water for the day. On one occasion a child kicked over the bucket and was ordered to drink the vomit, but, fortunately, after putting the bucket to his mouth Father apparently passed out and the child did not drink.

With regard to the daughter, the foster mother testified extensively how the daughter's own physician did not know that she had a shunt for spina bifida, that there were notably no records of care from the time she was two years old for any condition other than colds and the like, although she was fifteen at the time of the termination trial. Father, however, believed that she did receive treatment after the age of two in Portland, Oregon. She further testified that the daughter's kidneys have been damaged and her bladder misshapen for lack of bladder training, which could have been less severe with proper care. She may lose a kidney and may need bladder repair surgery. The foster mother had contact with the daughter when she was in the sixth grade and she frequently ran out of diapers and the smell was a problem for her and others. At the time of coming into care, the daughter had never been to a dentist and was in need of new glasses. On an ongoing basis, she needs to see her physicians regularly, she has short-term memory loss and forgets to take her medications and must be reminded to shower each day because of smell. She needs to be catheterized five times per day and is still bowel training,

having occasional bowel movements during school. The foster mother testified that, in this way, the daughter needs attention "24/7" and someone to care for her and who will follow through with all that needs to be done for her. Father testified that while he had not been privy to her most recent care, he could take care of her, although he would not personally provide catheterization and would need to secure someone else to help in that regard. He stated that he believed that he could provide for her needs whenever necessary with time off of work and with the assistance of a babysitter after school. While Father's desire to care for his daughter appears genuine, the magistrate's finding that he did not have a "basic understanding of his daughter's medical needs" is supported by substantial and competent evidence in the record.

The extensive neglectful and abusive family history presented no evidence of "proper parental care" or ability to "discharge [parental] responsibilities." *See* I.C. § 16-1602(25)(a), (b). Father's severe and long-term alcoholism resulted in physical and emotional violence to the children. In regard to the daughter, Father demonstrated little understanding of, or concern for, her significant needs prior to her entering foster care. The primary case worker testified that the historical information was important to the family dynamics and demonstrated that Father had not been a resource for his children. From this starting point, Father had a significant road to traverse to demonstrate an ability to properly care for his children.

The real issue in this case is not, as the majority has chosen, challenging the findings of fact of the magistrate, all of which are supported by substantial and competent evidence in the record. The real issue in this case is whether it was in the children's best interest to give Father more time to progress. At the time of trial in November, Father had made, beginning in approximately April, a genuine and obviously heartfelt effort at sobriety for the first time in his life. He attended classes and meetings. He testified that he knew that he had to become sober before he could provide for his children. He had the support of his employer. He had much better relationships with his children. He loves and wants his children. Yet, Father also acknowledged that, at the time of trial, he did not have a stable financial situation or housing for the children. He estimated needing three to four months to reach those goals. He testified that he would have been farther along if he had taken the matter seriously before getting out of jail. He had not completed parenting and anger management classes. He did not have a driver's license. Importantly, the primary case worker testified that it "would be a long time" to rehabilitate Father to where he could provide a home for the children. He further testified that

because of Father's extensive substance abuse, "the time table for his treatment would have to be quite a while to show that he's going to be able to maintain sobriety." He stated that he did not think that Father could provide the care his daughter needs and that she would need to have personal care service. On the other hand, he testified that the children presently needed parents who could provide stability. In addition, he testified that the children would experience a detrimental effect without permanence soon.

The magistrate was aware of all of the facts, including Father's history, his progress, and his sincere desire for his children. The magistrate did not give "inadequate attention" to any of the facts. The magistrate was aware that Father was asking for more time in the ultimate best interest of the children. The magistrate recognized that Father was making progress but was not in a position to take the children back and chose permanence for the children. While the magistrate could have granted more time, the magistrate's findings and conclusions are supported by substantial and competent evidence.

## B.    Disqualification.

I would affirm the magistrate's denial of the motion to disqualify. The majority concludes that the magistrate, in ruling on the motion, applied the "extrajudicial source" rule, without also applying the "pervasive bias arising from facts and events occurring at trial" rule from *Bach v. Bagley*, 148 Idaho 784, 791-792, 229 P.3d 1146, 1153-1154 (2010). I would first note that the magistrate did quote from a treatise which suggested that a judge's reaction to facts and evidence developed in a case cannot create disqualification for bias or prejudice. However, that language is not very different from the language cited by *Bach*, at 791-792, 229 P.3d at 1153-1154, from *Liteky v. United States*, 510 U.S. 540, 114 S. Ct. 1147, 127 L.Ed.2d 474 (1994):

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for his bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to the completion of the judge's task. . . . "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

*Id.* at 550–551 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

> It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute valid basis for a bias or partiality motion. . . . and can only in the rarest circumstances evidence the degree of favoritism or antagonism

28

required . . . . Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–556.

In ruling on the motion, the magistrate specifically recounted his revulsion to facts and events which he had been made aware of in the proceedings, but stated that he was not biased therefrom. Thus, the magistrate squarely addressed the question of bias arising from facts and events from the proceedings themselves.

In fact, Father claims, contrary to the majority finding, that it was the extrajudicial source issue that the magistrate did not specifically comment on and, therefore, did not directly address. Father had claimed that the magistrate's prior comment that Doe's case was "legendary" in protective act circles and the magistrate's participation in a prior criminal matter involving Doe raised concerns regarding prejudice developed from sources outside the instant matter. Indeed, the magistrate did not directly comment on the extrajudicial source issue, however, it was clearly presented to the magistrate and, in my view, subsumed within the denial of the motion. The asserted extrajudicial sources were wholly inadequate to demonstrate pervasive bias.[3]

---

[3] I further disagree with the view of the majority expressed in the final footnote of the majority opinion. The majority suggests that there is an inherent bias and risk of prejudgment in parental termination cases when the judge deciding the termination case also presided in the shelter care and child protective proceedings. I think quite the contrary. The judge who presided in the shelter care and/or child protective proceedings is in the best position, due to familiarity with past circumstances, to appreciate the strides, successes and improvements of the parents over the course of the case plan, or the lack thereof. That judge, who may have observed the parents at their worst, should be most able to recognize genuine progress. Moreover, in this case, and I would venture most cases, the judge presiding over the termination proceeding was presented with evidence of the situation, circumstances and conduct that led to the children being placed in the custody of the Department. Thus, even without being privy to such information from past proceedings, the judge deciding the termination case is made aware of those circumstances. If those facts would repulse the judge in the shelter care or child protective proceeding, they would repulse a different judge in the termination proceeding.