## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 47250

| | |
|---|---|
| In the Matter of: Jane Doe II,<br>A Child Under Eighteen (18) Years of Age.<br>------------------------------------------------------------<br>JANE DOE I and JOHN DOE I, Husband and Wife,<br><br>   Petitioners-Respondents,<br><br>v.<br><br>JANE DOE (2019-23),<br><br>   Respondent-Appellant. | Boise, December 2019 Term<br><br>Opinion filed: December 20, 2019<br><br>Karel A. Lehrman, Clerk |

Appeal from the Magistrate Court of the First Judicial District of the State of Idaho, Bonner County. Lori Meulenberg, Magistrate Judge.

The judgment of the magistrate court is affirmed.

Featherstone Law Firm, Chtd., Sandpoint, for Appellant.

Berg, McLaughlin & Nelson, Chtd., Sandpoint, for Respondents.

_____

MOELLER, Justice.

This case arises from a private action by grandparents seeking to terminate the parental rights of a mother—their daughter—to her child—their grandchild. Grandparents seek termination of Mother's rights to Child on the grounds Mother abandoned Child, Mother neglected Child, and that termination of Mother's parental rights was in Child's best interests.[1] Following the trial, the magistrate court granted the Grandparents' petition, ultimately concluding that Mother's conduct met the definitions of abandonment and neglect set forth in sections 16-2002(5) and 16-1602(31) of the Idaho Code. The magistrate court further concluded that termination of Mother's parental rights was in Child's best interests. We affirm.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

---

[1] As is our convention, the names of the parties have been replaced with their respective family titles, which will be treated as proper nouns throughout this opinion for ease of reference.

Child was born on January 5, 2010, in Bonner County, Idaho. Grandmother (Mother's biological mother) and Grandfather (Mother's step-father) have been the primary caretakers of Child since her birth with the sole exception of a four-month period when Mother cared for Child. Grandparents have had full custody of Child since March 2012. Initially, Mother and Child lived with Grandparents—a time when "[Mother] would stay out until all hours, sleep, eat, and go out again, while leaving [Child] in [Grandmother's] care." During this time, Grandmother found methamphetamine in Mother's room where she stayed with Child (who was approximately two years old at that time) and the family reported instances of paranoia and drug use by Mother. The exact date Mother moved out of Grandparents' home is unclear from the record, but Grandmother became Child's legal guardian on July 2, 2012. As guardian, Grandmother can refuse Mother's visitations if Mother is "incarcerated, homeless, or under the influence of drugs," as well as request a drug test if she suspects Mother is under the influence of drugs.

Mother has two other children from previous relationships, each cared for primarily by their respective fathers. Mother does not have custody or primary caretaking responsibilities of any of her children. Mother's past relationships have resulted in criminal charges of violence brought against Mother, and Mother consistently relies on boyfriends, family members, or other friends for a place to live. For instance, between July of 2014 and March of 2015, Mother's listed residences rotated between three different boyfriends interspersed by 32 days in Bonner County Jail in connection with two separate incarcerations. Mother's ex-husband testified that "[Mother] jumps from house to house, you know, from guy to guy who will supply her lifestyle or whatever she needs." One example of Mother's on-again, off-again relationships is with an ex-fiancé who filed a domestic abuse charge against Mother in October of 2018. Mother's probation officer later testified that the ex-fiancé physically abused Mother and that he is "not very conducive for her -- her sobriety at this time." Yet Mother has renewed this relationship multiple times.

Mother's work history is equally sporadic. The district court found that "Mother seems to be employed consistently; however, she is never consistently employed," with jobs changing every few weeks or months. Child's financial support stems primarily from Grandparents, with Mother giving Child gifts at birthdays and holidays—*i.e.* a sweatshirt, hat, iPhone, hover board, BB gun, etc.—as well as helping pay for some clothing or occasionally giving Child spending money.

Grandparents testified that Mother visited Child infrequently and often missed scheduled appointments. Mother alleged that Grandparents often changed the visits at the last minute, were unwilling to reschedule Child's schedule, and discouraged several gifts Mother gave as unnecessary or extravagant. Mother also stated that she requested a set visitation schedule multiple times, but that Grandparents never set that up. For the last seven years, Mother's residences have been approximately 45–60 miles away from Child, and Mother cites several reasons she cannot visit Child more often: lack of gas money, no reliable transportation, and that Grandparents have alcohol and firearms in their home, which would violate Mother's probation. In one instance where Mother informed Grandmother that she needed gas money, Child said "I have cash" and "loaned" $16 to Mother.

Child is enrolled in a variety of extracurricular activities, including swimming lessons, dance, gymnastics, and golf camp, but Grandparents testified that they were always willing to make Child available to see Mother. Prior to 2016, Grandparents testified that Mother followed her visitation order "most of the time." The court compiled the following data on Mother's visits from 2016 onward based on Grandparents' records:

- December 21, 2016 to December 13, 2017: on average 2.16 visits per month;
- December 13, 2017 to September 6, 2018: on average 1.6 visits per month;
- September 6, 2018 to April 2, 2019: four visits total, on average 0.56 visits per month.

While the trial of this matter was continued, between September of 2018 and April of 2019, three of those four visits—each one unannounced—occurred within the week of Christmas (visiting December 25, 28, and 30 in 2018). The fourth visit appears to have been in late March, making approximately three months of no visits to Child both prior to and following Christmas. Mother testified that the visits decreased during this time because of her drug use. By April 2019, Mother was tested for drugs eight times per month, and attended AA meetings and counseling in Rathdrum. However, Mother never asked her probation officer to send copies of the UA tests to Grandparents for visits with Child.

Psychiatric records indicate Mother admitted a history of emotional, physical, and sexual abuse, as well as being diagnosed with ADD, ADHD, bipolar disorder, and depression. Mother has also discussed a history of suicidal thoughts "but states that she 'wants to live.' " However, the record indicates that Mother only pursued counseling once in 2015 and twice in early 2019 (while under court order). In addition, Mother "has shown serious anger issues, which she is

3

unable to control on her own." Mother's sister testified that Mother exhibits "erratic behavior," but is making progress in her mental health and struggles with addiction even if she has yet to achieve stability. Another family member reported instances of neglect and improper care to new dogs Mother acquired, including an instance of allowing a puppy to grow into its collar for so long "it was embedded into her skin."

Grandmother and Mother have a "history of conflict . . . that continues to present," and that "goes from peaceful to discord quite frequently." Mother alleges that Grandfather physically abused her when she was young. In addition, Mother alleges Grandmother struggles with alcoholism, concerns that were shared by Grandmother's ex-husband (Mother's biological father). Despite these allegations, Mother has maintained communication with Grandmother, who has supported Mother through "her legal issues," including providing money for use in prison and aid to find housing on her release. While the magistrate court later stated that it "believes there are some red flags regarding [Grandmother's] use of alcohol," the court noted "there has been no dispositive evidence that [Grandmother's] alcohol use is detrimental to [Child]."

In addition, family members—as witnesses on behalf of both sides—have said that Mother has a reputation for being untruthful. Some examples of this reputation from the record include: Mother did not share her recent drug use with the evaluating psychiatrist in January and February of 2019, despite having used methamphetamine the previous three months. Mother also once asked a friend to take a drug test for her, sending a text message that read:

> Hey odd question if I buy a drug test can you take it for me I've smoked pot and I don't [sic] think it's out of my system yet and my mom wants a ua done and the result emailed to her . . . you own a day care I can just tell her you gave me the same test you do your employees.

Likewise, Mother has even admitted to lying to a guardian ad litem in the past about the instability of her residences and relationships "to look better to the court."

Since 2012, Mother has been in and out of jail or prison for various substance abuse charges and crimes of violence. In 2014, Mother was incarcerated for 32 days on charges of domestic battery, malicious injury to property, no contact order violations, and probation violations. That same year, on July 28, 2014, Mother petitioned for termination of the guardianship of Child. Ultimately, the petition was denied on finding Mother was unable to provide a safe and stable home for Child. In reviewing that petition, the guardian ad litem

4

specifically noted that between July of 2014 and March of 2015, Mother had changed residences seven times, been incarcerated for 32 days, did not take her medications, failed to attend counseling, and lacked both a car and job. The magistrate court ultimately denied Mother's petition for termination of the guardianship; however, the court issued a visitation order, which Mother followed "most of the time" until she was later arrested and incarcerated.

In January of 2016, Mother was charged with two felonies: strangulation and domestic battery or assault in the presence of a child. This domestic altercation arose after her then-husband discovered a message on Mother's phone about obtaining drugs and confronted her, causing Mother to "attack[] her husband while he was holding their infant child," biting and "clawing at" him, "caus[ing] injuries to his shoulder, wrist, and face." Mother fled with her two youngest children, but she was soon arrested by Idaho State Police on the highway. Following her arrest, both Mother and her infant were tested and found to have methamphetamine in their systems because Mother was breastfeeding while using the drugs. Mother was subsequently charged with felony attempted injury to a child. At the time of this incident, Mother was pregnant with her fourth child.

Following these felony charges, the court modified Mother's visitation rights by suspending overnight visits and requiring visitations to only occur at Grandmother's home or another location agreed upon by Grandmother, Mother, and Child's guardian ad litem. Later that year, Child's surname was changed to Grandparents' family name, a change Grandmother says Mother initially supported. While Mother was incarcerated for several months, she spoke to Child three times on the phone and wrote to Child four times. Grandmother kept money on the phone account so that Mother could call Child anytime from prison, and also made efforts to help Mother find housing after her release. While in prison, Mother completed the rider program and several classes dealing with aggression, substance abuse, grief and loss, and responsible mothering. Nevertheless, within a month of Mother's release—in early January of 2017—she was arrested again and charged with felony grand theft, which was later reduced to a misdemeanor.

Grandparents filed a "Petition for Termination of Parental Rights and to Adoption by Grandparents" on December 11, 2017, seeking termination on the grounds Mother abandoned and neglected Child, and that termination of Mother's parental rights was in Child's best interests. The petition also sought the termination of Child's biological father, who consented to

termination of his parental rights within a week of being notified. Grandmother later testified that she and her husband brought the petition for termination of Mother's parental rights to provide long-term safety, security, comfort, and consistency for Child. Grandparents wanted to avoid Child being placed "in an unsafe situation" and to ensure that Grandfather could continue caring for Child in case anything happened to Grandmother. Nevertheless, Grandmother also testified that she wants Mother to be in Child's life. Grandfather also testified that they hoped the petition would "shock" Mother into changing her life around.

The magistrate court held a trial which began on September 5 and 6, 2018. On the third day, Mother's attorney requested a continuance due to Mother's health and emotional state after Mother experienced "an anxiety-induced manic episode." The magistrate court granted the continuance and ordered Mother to submit to an independent psychological evaluation, so Mother attended two psychological evaluations with Dr. Johnson in January and February of the following year. The trial eventually resumed on April 2, 2019, and was completed the next day.

During the seven-month continuance between trial dates, Mother relapsed and fell back into trouble with the law. Between October and December of 2018, Mother relapsed into drug and alcohol use after her "manic episode" caused by the stress of trial and was incarcerated twice. By the end of 2018, Mother had a pending probation violation for methamphetamine use. She submitted written statements that she began smoking meth on October 20, and within weeks had progressed to smoking "a couple bowles [*sic*] a day" and then "7-8 bowles [*sic*] a day." On December 1, 2018, Mother "smoked meth" three times that day, "hitting it about 2-3 times each time." In court, Mother admitted to using drugs between mid-October and December in 2018, but alleged that December 3 was the date she "last used." In addition to the methamphetamine relapse, Mother became involved in another violent domestic incident on October 26, 2018, when she attacked her ex-fiancé during an argument over title to the home they had purchased together.

After the trial resumed in April 2019, Mother testified of her instability and difficulties during the previous six months:

> These last few months I haven't been healthy mentally and I've been trying to get back on my own two feet. And then with my house burning down and not having a job, I've been struggling to just, you know, be able to eat and have a place to sleep. And I'm not just getting to that spot. And with all these proceedings and whatnot, and my parents noting every little thing that I do and just their evil, little scheming ways is -- I'm not mentally prepared to be around them and enjoy the

6

time that I have with my daughter. I'm getting there now that I'm getting more stable, but it's a fear I have.

Following the hearings, counsel for both parties submitted written closing statements to the magistrate court. There was no case plan for reunification because this is a private termination proceeding.

On May 22, 2019, the magistrate court issued its Findings of Fact, Conclusions of Law, and Order for Termination of Parental Rights, which accompanied the final judgment to terminate Mother's parental right as to Child. The magistrate court found that Child is in a "good home" and "well cared for," with Grandmother and Grandfather (collectively, "Grandparents") providing "almost all of [Child's] financial needs" and ensuring Child attends "regular medical appointments, school, and participat[es] in other activities." The court concluded that Mother's relationship with Child was not that of a typical parental figure, but that of an "occasional playmate." A combination of factors led the magistrate court to conclude that Grandparents had established a prima facie case of abandonment, citing to Mother's inability to provide a safe and stable home, ongoing mental health issues, financial incapacity, sporadic employment, relapses into methamphetamine use, legal problems, unstable relationships and history, inability to appear for regular and consistent visits with Child, lack of efforts to improve her situation, and the "failure to maintain a normal parental relationship for greater than the statutory six (6) month time period." Likewise, the magistrate court found evidence Mother neglected Child by not providing proper parental care, control, or subsistence for Child's wellbeing. Accordingly, the magistrate court concluded that Mother's conduct constituted abandonment and neglect pursuant to sections 16-2002(5) and 16-1602(31) of the Idaho Code. The magistrate court went on to conclude that termination of Mother's parental rights was in Child's best interests and granted Grandparents' petition. Mother timely appealed.

## II.    STANDARD OF REVIEW

"The grounds for terminating a parent-child relationship must be proved by clear and convincing evidence" because "each parent has a fundamental liberty interest in maintaining a relationship with his or her child." *In re Doe*, 156 Idaho 103, 105–06, 110, 320 P.3d 1262, 1264–65, 1269 (2014) (citation and internal quotation marks omitted). On appeal, this Court has limited review of the factual findings and will not disturb the magistrate court's conclusion to terminate parental rights "so long as there is substantial competent evidence in the record to

7

support the findings." *Id.* (quoting *Matter of Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991)). "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Doe v. Doe*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010) (citation and internal quotation marks omitted). The findings are competent if they are supported by substantial, albeit conflicting, evidence. *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009).

On reviewing the findings, the Court will "indulge all reasonable inferences in support of the trial court's judgment," ever mindful that the finder of fact has the opportunity to observe witnesses' demeanor, assess credibility, detect prejudice or motive, and judge the parties' character. *In re Doe*, 156 Idaho at 105–06, 320 P.3d at 1264–65. "In a parental-termination case, this is immensely important" because the "cold record of the trial does not tell the whole story. An independent review by our court could not take into account the trial court's superior view of the entire situation." *Id.* (citation omitted).

## III.    ANALYSIS

A court may grant an order terminating parental rights where such termination is in the best interests of the child and the parent has either abandoned or neglected the child. I.C. § 16-2005(1). Here, the magistrate court determined that Mother met the definitions of both neglect and abandonment, though only one was sufficient to terminate her parental rights to Child. I.C. § 16-2005(1); *Matter of Aragon*, 120 Idaho at 611, 818 P.2d at 315 ("the statutory grounds for termination under I.C. § 16–2005 are independent and if any one or more of the grounds for termination are found, termination may be granted."). Mother contends that the magistrate court erred in finding (A) she abandoned and neglected Child, and (B) that the termination of Mother's parental rights was in Child's best interests. We will address each issue in turn.

### A. The magistrate court did not err in finding that Mother abandoned Child.

Because Grandparents are seeking adoption following the termination of Mother's parental rights, only a six-month period without a normal parental relationship is required for prima facie abandonment. I.C. § 16-2002(3). Mother argues the trial court failed to take her individual circumstances into account, in particular her bipolar disorder, continuing battle with addiction, limited family support, high-conflict relationship with Grandparents, and the repeated refusals for a set visitation schedule. Grandparents contend that Mother is merely asking the Court to reweigh the magistrate court's findings. We agree.

Abandonment is one of the grounds for the termination of parental rights. I.C. § 16-2005(1)(a). Section 16-2002(5) of the Idaho Code defines "abandoned" as

> the parent has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact. Failure of the parent to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment under this section; provided however, where termination is sought by a grandparent seeking to adopt the child, the willful failure of the parent to maintain a normal parental relationship as provided herein without just cause for six (6) months shall constitute prima facie evidence of abandonment.

The failure to maintain a normal parental relationship can be based on either the absence of reasonable support or regular personal contact. *Doe I v. Doe II*, 161 Idaho 532, 535, 387 P.3d 785, 788 (2016). "There is no universal standard for what constitutes a normal parental relationship, and whether such a relationship exists depends on the facts and circumstances of each case." *Doe v. Doe*, 150 Idaho 46, 50, 244 P.3d 190, 194 (2010). Thus, the petitioner bears the burden "to demonstrate that the defendant lacks a normal parental relationship with the child and that there is no just cause for the failure to maintain such a relationship." *Id.* If that burden is met through the presentation of clear and convincing evidence, the defendant will have the burden to show just cause for failing to maintain the parental relationship. *Id.* Without just cause, the petitioner will have met its burden of persuasion. *Id.*

Mother points to *Doe v. State*, 137 Idaho 758, 53 P.3d 341 (2002), to illustrate how the court must consider the parent's individual circumstances in a parental rights termination proceeding. In that case, the father was incarcerated and failed the rider program. *Id.* at 759, 53 P.3d at 342. The father was in prison at the time of his son's birth and had never seen his child. *Id.* After learning of his son's birth, the father sent multiple gifts, and attempted to contact both the mother and maternal grandmother, neither of whom responded. *Id.* Following a state petition, the magistrate court terminated the father's parental rights, accepting father's inability to complete the rider program and his limited contact as substantial competent evidence of abandonment. This Court reversed, explaining:

> There is an issue, however, of what actions Doe could have taken, once in prison, to maintain contact with his child. Doe sent his child gifts and made efforts to contact the child through the Department and through the child's maternal grandmother, but he was unsuccessful. One must ask what more could Doe have done? The Department's argument is that he could have completed the "rider" program successfully and gotten out of prison early. The magistrate accepted this as evidence of abandonment. That is not the type of substantial

9

competent evidence that supports a finding by clear and convincing standard of abandonment. The Department trivializes Doe's efforts to have a relationship with his son. Reality must play a part at two levels: 1) Doe was severely restricted in what he could do. Within that context he tried to establish a relationship. 2) The Department did little or nothing to assist in that effort. The Department focused on the best interest of the child—laudable in the abstract but without regard for the parental rights possessed by Doe.

*Id.* at 761–62, 53 P.3d at 344–45. Thus, this Court required the magistrate court to consider the father's personal circumstances, despite undisputed evidence that father had never seen or provided support for his child. *See id.*

Mother's appeal turns on the contention that the magistrate court failed to consider specific evidence of her personal circumstances. She cites specifically to her efforts to treat her mental health (especially her bipolar disorder), continuing battle with addiction, family difficulties, and explains that many visits with Child were missed because of Grandparents' miscommunication and repeated refusals to set a visitation schedule. However, the magistrate court considered all of the evidence Mother says it did not. Mother is simply asking us to weigh the evidence in her favor when "appellate courts in Idaho do not reweigh evidence." *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007).

Looking at the record, Mother has failed to establish that the magistrate court's findings were erroneous. First, Mother's declaration that she "consistently sought treatment" is misleading, and ultimately undercut by evidence of her limited meetings with mental health programs and professionals. Her brief cites to multiple visits, but the first one, in September 2018, was an appointment made following her manic episode in the stress of trial. Mother then renewed her AA program in December of 2018 after three months of relapsing into methamphetamine use and pending probation violations, and visited Dr. Johnson twice in early 2019 as required by the court. Prior to these appointments, Mother attended counseling back in 2015 but she did not continue the treatment. These few attempts at treatment are not examples of consistent efforts; rather, they demonstrate that Mother seeks mental health treatment only as a last resort or at the insistence of the courts. All of this evidence was considered and weighed by the magistrate court, which concluded:

There is no evidence that [Mother] has the ability to engage in long-term mental health treatment. [Mother] would like the court to believe that she is serious about her treatment now. However, it is only now, when she was court ordered to get an evaluation and when she is facing an additional probation violation and potentially more prison time is she seeking medical treatment/counseling for her

mental health. [sic] i.e. began with Dr. Johnson in January 2019. There was no evidence that the potential loss of her parental rights, initiated by petition in December of 2017, was sufficient motivation for her to seek help. It is also clear that when she has bipolar symptoms she is unable to care for her child.

Likewise, the magistrate court considered the family relationships and contention between Mother and Grandmother. The magistrate court noted both the ongoing conflicts between Mother and Grandmother, as well as the frequent communication between them. The court also considered Grandmother's aid to Mother in maintaining a phone account for Mother to call Child from the prison, and her efforts in helping Mother in securing housing on her release from prison. The magistrate court considered all of the evidence from allegations of Grandmother's alleged alcoholism to Grandparents refusing to set up a visitation schedule. The consideration of the hostile relationship, as well as Mother's relationship with Child, is included in the court's analysis; in short, the court did not "minimize" Mother's circumstances simply because it found evidence in favor of termination more substantial.

As found by the magistrate court, the evidence highlights Mother's lack of stability rather than great efforts towards achieving it. While Mother's ongoing battle with addiction to methamphetamine is understandably a substantial struggle prone to setbacks, Mother continues to make decisions that increase her risk of relapse, including renewing abusive relationships and continuing to violate the law. Indeed, Mother's own testimony reveals the instability of her situation and her inability to provide a normal parental relationship with Child:

> These last few months I haven't been healthy mentally and I've been trying to get back on my own two feet. And then with my house burning down and not having a job, I've been struggling to just, you know, be able to eat and have a place to sleep. And I'm not just getting to that spot.

This instability led to Mother's failure to maintain either reasonable support or regular personal contact with Child. Financially, even with Mother's repeated attempts to maintain regular employment, she has failed to meaningfully support Child for years beyond some gifts, clothes, and occasional spending money. Likewise, Mother's addiction to drugs and alcohol halted visits with Child almost altogether between September 2018 and April 2019—the very period during which the trial of this matter occurred. Mother's visits with Child have steadily decreased over the years despite Mother's alleged efforts to reach stability. As noted by the magistrate court, "[t]he fact that she did complete the Rider program at the Boise State Woman's Correctional

11

Center in 2016 and still by her own admission was using methamphetamine at the end of 2018 indicates that [Mother] has not been able to stop using."

Ultimately, the magistrate court considered the exact arguments and evidence Mother now presents to this Court:

> Most of [Mother's] testimony was how she has roadblocks such as mental health issues, substance abuse issues, and conflicts with her mother/[Grandmother] that interfere with her ability to be stable. [Mother] stated in effect at trial "She is my daughter, We love each other, I am there for her no matter what". That is not true, in reality [Mother] has never been "the parent" for [Child] and there appears to be no responsibility taken by [Mother] to be a parent.

Accordingly, the magistrate court found by clear and convincing evidence that Mother failed to maintain a normal parental relationship for more than the six-month statutory period, and appropriately concluded this was prima facie abandonment under Idaho Code section 16-2002(3).

Like the case *In re Doe*, Mother improperly "asks this Court to reweigh the evidence," and "fails to acknowledge that the [trial] court was the finder of fact." 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). As previously stated, we cannot reweigh the evidence. *State v. Doe*, 144 Idaho at 842, 172 P.3d at 1117; *In re Doe*, 156 Idaho at 108, 320 P.3d at 1267. Therefore, we affirm the magistrate court's findings of abandonment pursuant to section 16-2002(5) of the Idaho Code. Inasmuch as only one ground for termination is necessary, we need not address the issue of neglect. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006).

**B. The magistrate court did not err in finding that the termination of Mother's parental rights was in the best interests of Child.**

Mother's next argument is that the magistrate court erred in finding that the termination of Mother's parental rights was in Child's best interests. Grandparents again argue that "Mother merely asks this Court to reweigh the evidence related to her methamphetamine use and her alleged progress in terms of her mental health." We agree and affirm the district court's judgment.

While either neglect or abandonment may act as the grounds for terminating parental rights, the court must still determine whether such termination is in the best interests of the child. I.C. § 16-2005(1); *see also Matter of Doe II*, 165 Idaho 199, 443 P.3d 213, 218 (2019). When making the best-interests analysis, numerous factors are to be considered: "including the stability and permanency of the child's current home, unemployment of the parent, the financial

12

contribution of the parent to the child's care after the child is placed in protective custody, improvement of the child while under other care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law." *Matter of Doe II*, 165 Idaho at 443 P.3d at 218. A determination that termination of parental rights is in the best interests of the child "must be based on objective grounds and supported by substantial and competent evidence." *Id.*

Mother cites to *Idaho Dep't of Health & Welfare v. Doe*, 150 Idaho 752, 250 P.3d 803 (Ct. App. 2011), as an analogous case of a parent struggling with addiction. In that case, an alcoholic father was arrested after striking one of his four children while under the influence of alcohol. *Id.* at 753, 250 P.3d 804. Upon seeing the "filthy" and abusive conditions of the home, all four children were taken into custody of the Department of Health and Welfare. *Id.* Following a case plan for reunification, the father immediately began alcohol treatment and attending AA meetings. He also attended weekly visits with his children. *Id.* at 754, 760, 250 P.3d at 805, 811. Though the father relapsed into alcohol use for several weeks, father restarted treatment, was rehired by his former employer, became the manager, obtained rent-free housing at his place of employment, and was actively searching and saving for a home for his family. *Id.* Yet despite the guardian ad litem's consistent commendations that father was progressing in his case plan, the court announced that it was terminating father's parental rights. *Id.* at 754–56, 250 P.3d at 805– 07. The Court of Appeals reversed this decision, explaining that termination was not in the best interests of the children when father had made "substantial strides in treatment for his alcoholism, maintaining sobriety, rebuilding a loving relationship with his children, and achieving financial stability that would enable him to provide appropriate housing for his children." *Id.* at 757–58, 250 P.3d at 808–09. The Court of Appeals also noted the error for the magistrate court to terminate father's parental rights for not completing tasks that were never part of the case plan, including completing anger management counseling (which father voluntarily attended anyway). *Id.* at 758, 250 P.3d at 809.

While the struggle with addiction is similar to Mother's situation, there are several key differences between this case and *Idaho Dep't of Health & Welfare v. Doe*. First, the father underwent consistent treatment, demonstrated substantial efforts at maintaining sobriety, and voluntarily attended additional programs like anger management counseling. In contrast, Mother's efforts to care for her mental health consists entirely of occasional court ordered counseling sessions and renewed participation in AA and NA programs. Second, while the father

13

in *Idaho Dep't of Health & Welfare v. Doe* obtained housing for himself and worked towards purchasing a home for his children, Mother remains dependent on others for housing just as she has for the last nine years. Third, while the father obtained employment and progressed professionally to provide for his family, Mother's employment remains sporadic, even if she is typically holding a job. In short, the father showcased commitment and progress—despite setbacks and a relapse with alcohol—while Mother's evidentiary record shows consistent instability and unchanged behaviors.

Here, the magistrate court made its determination that termination was in the best interests of Child based on numerous factors: "lack of stable employment, lack of efforts to improve her situation, failures to seek appropriate and long term mental health treatment including regular counseling and medication management, relapses into use of methamphetamine, periodic incarceration, and lack of frequent visitation and the fact that the minor child has been in the consistent and stable care of the petitioners since 2012." Moreover, the magistrate court noted that termination would allow Grandparents to adopt Child and "provide significant increased stability" in their home. The court appropriately concluded, based on clear and convincing evidence, that Child's best interests were not "to continue in an uncertain state." These factors are objective grounds that provide substantial and competent evidence favoring termination of Mother's parental rights to Child.

### C. No attorney fees on appeal.

Grandparents raise the additional issue on appeal that they are entitled to attorney fees pursuant to Idaho Code section 12-121, because Mother brought this appeal without foundation. The statute permits the court to award "reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Generally, an appeal is considered frivolous where it disputes the trial court's factual findings and simply asks the Court to reweigh the evidence. *Matter of Doe*, 164 Idaho 511, 518, 432 P.3d 60, 67 (2018). Nevertheless, "this Court has held that 'considering the seriousness of the liberty interest affected in parental termination cases,' an appeal in such cases 'to reexamine conflicting evidence is not frivolous.' " *Id.* (citation omitted).

Whether to award attorney fees is an admittedly close call in this case because the bulk of Mother's arguments have essentially asked the Court to reweigh the evidence, rather than

14

addressing any legal errors by the trial court. Nevertheless, because of the profound and fundamental liberty interest at stake—and the presence of some conflicting testimony at trial— we deny Grandparents' request for attorney fees.

## IV. CONCLUSION

As there is substantial and competent evidence supporting the magistrate court's factual findings, we affirm the decision to terminate Mother's parental rights. Costs are awarded to Grandparents.


Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**